Association of New Mexico et al. v. PG&E Corporation. And we will hear from Mr. Ekin first. I think May it please the court? Hold on a second. Was the time on the clock supposed to be split? Not for Mr. Ekin. He has 15, although I'm sure he's going to reserve something. PG&E is splitting the time. Thank you, Your Honor. Michael Ekin on behalf of the appellants. Apologies in advance, but as I mentioned earlier, I'm battling a bit of a respiratory bug, so I may be taking extra sips of water during the presentation out of necessity and hopefully no unintended causing. That's fine, and thank you for letting us know. Your Honors, the issues on appeal are narrow and relate solely to what has been referred to as the insurance deduction set forth in PG&E's confirmed plan of reorganization. The issue relating to the propriety of the insurance deduction is relevant to and impacts only one class of creditors. They're impaired, subordinated creditors under the plan in Class 10A2, and they consist of holders. I'll refer to them as equity securities claims. So who are these claims asserted against? These claims are asserted against PG&E. They're individual proofs of claim asserted by each of the appellants for damages as against PG&E, separate and apart from the separate securities litigation that's pending before Judge Davar. My question is, how much of these claims overlap? I mean, aren't they based on the same alleged misrepresentations? Judge Wardlaw, they're based upon the same conduct, but PG&E, as opposed to the current and former officers and directors and the underwriters, was in bankruptcy. So those claims, by necessity, had to be alleged in the context of the Chapter 11 case. So they're alleged both in Chapter 11 and in the securities litigation? That's correct. So you have the potential for recovering for the same alleged misrepresentations through both fora? That's correct, Your Honor. We have no choice but to proceed in the bankruptcy case with respect to the claims against PG&E, the issuer. Counselor, let me ask you a question, and I hope you feel better soon, by the way. Thank you, Judge Wendt. Thank you. With regard to the insurance deduction issue, I really don't see this as being somehow the Bankruptcy Court not understanding the import of Ivanhoe, which was extensively discussed during the hearing. The way that I see it is really there's a fundamental difference between your view as to the import of the settlement on the formula, the conversion formula, and the Bankruptcy Court's view. So as the Bankruptcy Court explained, under the conversion formula, whatever the claim was worth was going to be converted into shares. And the Bankruptcy Court essentially treated that as full payment. And so, of course, under Ivanhoe, to the extent that any particular claimant actually received an insurance payment, that that is going to be a reduction to make sure that no one gets paid the full value. That's the disagreement between you and the Bankruptcy Court in the somewhat confusing exchange that you had during the hearing. But at the end of the day, your view did not prevail. So tell me why the Bankruptcy Court's view was not correct, and what in the record supports your theory that you didn't compromise out this issue by agreeing to the conversion formula? Thank you, Judge Wynn. I wouldn't exactly refer to what happened in the Bankruptcy Court as a settlement. And the fundamental difference is that we don't believe, and the numbers don't bear it out, that creditors in this class are being paid in full. Because once you apply the formula, you have to start with an allowed claim. Once you have an allowed claim, you have to apply the formula, which necessarily reduces the value of that claim. I'm sorry for interrupting you. I don't mean to do it, but I just want to make sure that I understand where we're going to end up at the end of the day from your perspective. Because you did argue that to the Bankruptcy Court that it's not akin to settlement. But as the Bankruptcy Court explained, it's really a compromise. And by compromising that formula, you really compromised the treatment methodology. Because there were different dates that could be asserted, and you got sent off the mediation, as I understand it. And you agreed to a particular compromise. So I'm sympathetic with the Bankruptcy Court in that it's not a dollar-for-dollar situation. So at some point, the dollar value of the claim is going to have to be converted to shares. So that's why I go back to, is the disagreement really over the import of the compromise? We won't call it a settlement. We'll call it a compromise over the conversion formula. So the import of that compromise to the Bankruptcy Court's view means that at the end of the day, there is full payment. And that's why the Bankruptcy Court wasn't disturbed by the insurance deduction coming out. So what do we look at to see that that compromise didn't work in the same way that the Bankruptcy Court viewed it? Judge Nguyen, the first thing we have to look at is the amount of the allowed claim. So we're starting with an allowed claim. And let me just give you an example to help frame the issue. Let's say a holder of a Class 1082 claim has an allowed claim of $130,000. And then you have to apply the formula under the plan. And that claim is the result of, let's say, purchasing shares on or before October 13th of 2017. So leave aside the insurance deduction for a moment. Once that creditor's claim is allowed, the $130,000 in damages gets divided by $65 under the plan. So that yields a distribution to that creditor of 2,000 shares. Let's take the current trading price of PG&E stock, which is about $17.30 a share or thereabouts. It was much less than that on the effective date, but that's the current trading price. If you multiply that times the 2,000 shares, that creditor is receiving value in the amount of approximately $35,000. Although they have an allowed claim in the amount of $130,000. Now the receipt of that stock under the plan is in full satisfaction of that creditor's claim against PG&E. There's no issue there. That's unfortunately what bankruptcy is all about, especially with respect to subordinated impaired creditors like my clients. So we understand that. But for purposes of Ivanhoe and for purposes of an offset, you have to examine the amount of the allowed claim, which is $130,000 in my hypothetical, as against the value that that creditor is getting under the plan by using that formula. And that is not payment in full of the allowed claim. There's still approximately $95,000 in loss or damages that has not been paid. So I think the bankruptcy court understood your hypothetical and that $130,000 worth of claims really doesn't translate into $130,000 worth of shares at the end of the day. But the bankruptcy court said that that's not under the conversion formula. You don't get to basically look at the current share value in figuring out whether it's full satisfaction or not. So that's where the error is then? I think that is precisely the error because what we're talking about is a distribution in connection with that creditor's claim against PG&E. And at what point in time are we looking at the share value? Well, I don't think that since most of these claims have not yet been compromised and they're still outstanding and the debtor is still going through a claims resolution process, you would have to look at the time that the allowed claim is established to determine what the share price is then and what that particular creditor is getting. So isn't there a high degree of uncertainty in this whole calculation because we don't know what the ultimate share value is going to be? Judge Wardlaw, that's exactly the point. We don't know what the share value is going to be. We don't know what the allowed claim is going to be. But nevertheless, the bankruptcy court determined... Right, but then under your theory, you could never confirm a bankruptcy plan. Right? Under your theory. Because unless you know the exact number and can exactly calculate what the value is going to be at that time, you could never do a prospective confirmation plan before everything is worked out. You know, my other question is we have to find clear error here, and I don't see how we can find that the bankruptcy court acted in a logical, implausible, or in a way that was without support in the record. So if we don't agree with your argument that Ivanhoe creates an affirmative defense or that any deduction has to be necessary to prevent double recovery, then why isn't the bankruptcy court's multiple findings that Class 1082 claimants would be paid in full and then looking at the terms 4.14 and 5.9 of the plan that say you're getting full and complete and final satisfaction, why couldn't we easily find that there was no illogical, implausible, or without support in the record ruling here? A couple of questions there, Judge Koh, and I'll try to get to all of them. I don't think there's any issue as to whether the debtor could confirm a plan and did confirm a plan, not knowing what ultimately the allowed claims of this particular class of creditors was going to be. The $17 PG&E share value that you just mentioned, what's the date of that share value? That's today. Yeah. So it really doesn't matter because bankruptcy plans are confirmed all the time with unknown amounts of allowed claims that are ultimately allowed or compromised or settled. This has been going on for quite some time, and as you know, this was a very complicated Chapter 11. To answer your other question, where is the view that the issue of the application of the insurance deduction as being consistent with the Supreme Court's ruling in Ivanhoe is a question of law and not a question of fact, and that that could be reviewed de novo by this Court. That's our position. We think that the Bankruptcy Court erred across the board with respect to essentially automatically applying the insurance deduction without knowing one way or the other whether there will be or won't be a payment in full or payment in excess of 100%. So the idea that the insurance deduction gets applied regardless is a serious error. So if we disagree with you that that's a factual finding as to whether Class 1082 would be paid in full and not a legal one, then what's the basis to find that the Bankruptcy Court here acted in an illogical, implausible, or in a way without support in the record? Well, we think the fundamental issue, and I apologize. I wanted to reserve some time for rebuttal, and I see the clock dwindling, but in any event, I think the basic problem is the finding that creditors in this particular class were being paid in full. There was absolutely no support for that on the record. Section 4.14 of the plan only talks in terms of satisfaction of the claim. There's no mention of payment in full. Look, for example, at the footnote in our reply where we cite to another bankruptcy case that Debtor's Counsel was handling where the same language appeared, full in satisfaction, release, and settlement of a claim, and that applied to a class of unsecured creditors who were getting 11 cents on the dollar under the plan. Now, that's what they're getting under the plan. That's in full and final satisfaction of their claims against the debtor, but it's not payment in full of their allowed claim. If they're getting 11 cents on a claim of a dollar, they're not getting paid in full. So this language, quite frankly, is language you find in many plans, every plan, and it focuses not on payment in full. If there's payment in full, it would say so, and if you look at the treatment of general unsecured creditors under the PG&E plan, you'd see that the language is that the allowed claim is being paid in full in cash. That's not the language under the treatment of Class 10A2. The treatment is different. Again, they're an impaired, subordinated class of creditors, and they're not getting paid in full, but whatever they're getting, they have no further claims against PG&E, and that's the import of that language, and I think Judge Mentale respectfully didn't focus on that and assumed that there may have been some settlement with respect to the allowed claim of these creditors, a settlement that we couldn't negotiate for them, but what we objected to, as Judge Wen mentioned earlier, was the formula. The initial formula in the plan was less favorable. We negotiated a better deal for that creditor body, but under any circumstances, we went into that mediation understanding that this class of creditors was not going to be paid in full out of the PG&E Chapter 11 plan. All right. Thank you, counsel. Let's hear from the other side. Mr. Slack? Thank you. May it please the Court, Richard Slack from Waugatcho for the appellee PG&E. Mr. Richardson, who represents the Tort Claimants Committee, is going to address their motion for equitable mootness. While we support it, he's going to be addressing those issues. Your Honor, I completely agree with the issue as it was laid out by Judge Wen. Section 4.14 of the plan provides that all allowed securities claims will be fully satisfied, using the words full satisfaction, upon the receipt of a number of shares equal to the full allowed amount of the claim, and what I heard counsel for the appellant say is that he agrees that full satisfaction was full satisfaction of the claim against PG&E, but the claim against PG&E is the allowed claim of $130,000. And so he's right. It is full satisfaction of the claim against PG&E, but that is the allowed claim against PG&E of, in his hypothetical, $130,000. And so under 4.14, once that claim is converted, it's a conversion factor to a fixed number of shares, those allowed claims are deemed fully paid, regardless of the trading price of those shares. So what is the potential for double recovery here? The potential for double recovery is that if you have an allowed claim of any amount, and that allowed claim is then provided, the number of shares in the conversion formula, then any amount of outside insurance, and look, we also say that insurance is an asset of the estate. We think the court can get to that issue. We think there's no factual issues. It's an independent ground to affirm, but the point is once there's an insurance payment on top of getting the amount of shares in the conversion formula, then that is an amount over and above the full satisfaction of the claim. And where does the insurance payment hypothetically come from? Does it come from the claims in the securities litigation? I think that the insurance deduction could apply to an insurance payment that's made directly on the claim, because you can make an insurance payment on the claim, or from outside in the district court action. It would come out of the shared portion of the insurance that both PG&E can use if it has claims against it, or the directors and officers could have a liability in the outside case. And indemnification? Exactly, exactly, Your Honor. Then PG&E would be responsible for indemnity. And that's really the key to the finality issue here. What the court recognized is that the language full satisfaction, okay, has a usual meaning. That meaning is, as Mr. Atkins said, is a full satisfaction of your claim, of your allowed claim against PG&E. Once that's done, there's finality. And that's a key to the plan. And that's, I think, what both the bankruptcy court and the district court recognized is that this plan has the finality. So if someone actually goes through the proof of claim process and has a allowed claim that's set, and then gets the amount of shares under the plan, under the formula, that they're fully paid, and there's no risk afterwards that someone's going to come from the back door and try to tag PG&E with some kind of indemnity claim on a separate claim. So, Mr. Slack, as I understand counsel's argument, that was not his understanding of the scope of the compromise. So he, and Mr. Atkins can correct me if I'm wrong, but as I understand his argument is they went out and mediated and compromised on the formula. But under that formula, because this is a subordinate class, the $100,000 worth in claims really should have translated, say, into 1,000 shares. But instead they compromised the formula so that it's 800 shares. So they're not getting paid the full value of their claim. And that's the basis of his objection to applying the insurance deduction. So any insurance received really would not be in excess of the 100% value of the claim. So how do you respond to that? I mean, this is, I find this, actually, this case very surprising because, you know, you went out and mediated the case, but you can't agree on the import of the formula that was agreed upon. So I find that surprising. I understand why the bankruptcy court said, look, you know, we don't have the luxury of figuring out what everybody's claims were, so we're going to have to kind of reverse engineer it. And you compromised the formula. That means that I can deem this in full payment. But I appreciate Mr. Atkins' point that that was a settlement only of the conversion, and his understanding was that that wouldn't give the claimant full value. So I agree that the unique part of this case is that in the Ivanhoe issue, which you don't see in any other case, is that it involves a conversion from essentially one currency to another. And I think what the bankruptcy judge and the district court both recognized is that the compromise under 1.109, and you may recall from the transcript, Judge Montali was actually surprised that there was a compromise on 1.109 and not on the insurance deduction. But the fact is that the conversion formula is just that. It is a formula that tells you how to convert dollars, an allowed claim, into shares. And what the plan then says, that's in full satisfaction of that claim. So while I understand the argument, I think Judge Montali understood the argument that Mr. Atkins was making. The fact is that once there was this agreement on the conversion, in other words the plan saying how many dollars you have when you convert into shares, that answers the question then of what you get. And what's interesting about that deal and about the conversion formula is that the deal means that all parties are taking risk. All parties are taking trading risk on the price of the stock. If the price of the stock is such that maybe a year, two years down the road, or whatever it is, when there may be an amount of an allowed claim that's getting paid, it might be sooner, but it might be then. PG&E can't go back and say, hey, the price is way up there, you're getting more than your fair share, so we're only going to pay you a certain number of shares. I think we all completely get this, and perhaps there might be an underlying assumption that the PG&E stock is at its nadir now, that it's actually in bankruptcy. But what I don't understand about this case is how you compromise on the formula, the conversion formula, without a full understanding of how the insurance would play into it. If it turned out that the directors and officers were deemed liable, but acting on behalf of PG&E and so that PG&E had the responsibility to identify them and then the insurance kicked in, that side B or whatever it is. How could these sophisticated lawyers come to an understanding as to the formula without nailing down how the insurance proceeds would play in? I can't answer as to Para, but I can tell you that from the company's position, and I believe the bankruptcy court and the district court, they looked at the plain language of the compromise and had to go by the plain language that talked about full satisfaction of the claims, which was agreed to in 4.14, and the conversion factor, again, which converts one currency to another with both sides taking trading risk. It seems to me that the issue of what full satisfaction means is important here, and I would point the court to the appellant's opening brief at page 25 and the RSC versus ResCap case where the plaintiffs themselves put in a parenthetical about how another court was viewing the Ivanhoe rule, and that court specifically said that, and they use it for this, that there has to be evidence in the record that a creditor has received full satisfaction of its claim. And, of course, that is the same language that's in the plan, full satisfaction. And so full satisfaction has to be given in this plan its normal and typical meaning. And, again, as I think Mr. Acton realized, full satisfaction of your claim in this case is the allowed claim, whatever that is. Your Honor, a couple of other points before... I haven't been able to ask any questions. Could I ask you some questions before you conclude? Sure. So can you address whether this issue of whether Class 1082 has been paid in full is a factual finding versus a legal one? I know you're arguing that it's a factual one. I mean, it's a mixed issue of law and fact because, obviously, there's an issue as to what Ivanhoe means. But I think that the court then looked at the testimony, and there was testimony and there was cross-examination of a PG&E witness about the insurance deduction issue. And what the court found is that based on the plain language of the plan and the testimony that there would be full payment here of the claims, full satisfaction of the claims. So I think it's a mixed issue of law and fact. That was going to be my next question. What evidence is there in the record that full and final satisfaction means full payment of the allowed claim? And you're saying there was testimony? What I'm saying is that there was questioning on the insurance deduction. I think in terms of the meaning of the term full satisfaction, I don't think there was any testimony in the record about what that particularly meant. I think you can look at that as a matter of the plan and interpret that given its usual meaning. And, again, as I said, if you look at the case that the appellant cited, they use that in its typical meaning when they discussed Ivanhoe. Okay, but where do we, other than 4.14, and I notice you don't rely on 5.9. The TCC does. Why do you not rely on 5.9? Do you think that's not relevant here? 5.9? Yes, you just rely on 4.14. Well, I guess I would say this, is that it certainly is the same, you know, it's the exact same concept. It's just in another place. But I do think that, you know, the 4.14 is more important here because it specifically relates to the particular claims at issue, and it was specifically agreed to by the appellants here. So you have it being more specific and agreed to, you know, by the appellants. So I guess I'm just, if we have to find whether there was support in the record for what the bankruptcy court did, do we just look at 4.14, or is there anything else that you could point to? Well, when you're saying support for what the court did, I think the court both interpreted. Go ahead. I guess for, you know, for full satisfaction of the claim, which I understand is your argument, right? You're not relying on what the district court relied on. The district court relied on possibility of double recovery. And I don't see you making that argument. You make the more, look, this was full and final recovery on the allowed claims. Well, we don't disagree with the district court saying that that would be enough. It just so happens that because of the plain language in 1.109 and 4.14, I don't think you have to get there because, you know, a full satisfaction when you do the conversion in 1.109 that was agreed to by this appellant. We agree with the district court. It's just you don't need to get there because what the district court was saying is, even if you have a, even if it's not every time, the bankruptcy court could say, you know, and there's nothing under Ivanhoe that prevents this, that if there's a risk of double recovery, even that, then the bankruptcy court can fashion a plan to eliminate that risk. And as long as there's a reasonable risk of that, then, you know, then there's, you know, then Ivanhoe doesn't apply. So we agree with that. It's just that we don't think you have to get there because it's very clear from the plan itself that this is full payment. You want to respond to the footnote four in the reply brief that says, full and final satisfaction doesn't mean what PG&E is arguing? Well, I think you have to look at a particular plan and what happened in a particular plan. I don't think we know about what's happening in the other plan, but I would say that if there's language in another plan that talks about full satisfaction, it could very well be that, and I would expect it is, that that is full satisfaction. The only time this issue would come up is when you have an Ivanhoe issue, for example. But here the point is, if it's in another plan that's agreed upon, if it's voted upon, it would mean exactly what it means in this plan. All right. Thank you, Counsel. You're well over your time. Let's hear a little bit on the equitable mootness aspect of this. Thank you, Your Honors. Good morning. David Richardson of Baker Hostetler, Counsel to the TCC. I'd like to briefly start with an Ivanhoe point and then move on to equitable subordination. I'm here on behalf of 80,000 fire victims who appear in this appeal to protect the equitable treatment of creditor classes under the debtor's plan. Ivanhoe is no longer codified under the Bankruptcy Code. It survives as an equitable doctrine, and relief that these appellants seek would be inequitable to fire victims and other unsecured creditors. The appellants are statutorily subordinated creditors, but the treatment they receive under the plan and fire victims receive is quite similar. Both groups settled or compromised with the debtor to receive a fixed amount of stock or a fixed combination of stock and cash to pay their claims. Both groups are deemed impaired but also paid in full by the plan, no matter what happens to the PG&E stock price and no matter what percentage of their allowed claim they ultimately receive. We believe the paid in full issue is primarily an issue of law. In page 15 of our brief, we deal with the In re Applause case and the Second Circuit's Shadowgate case, which find that payment in full at any amount by settlement is full payment. The example in footnote 4 that was given by the appellants deals with the example that's in our brief, comparing a case that only pays a portion, say 10%, 20% of claims, versus a case where all the amounts are settled and paid in full. Both groups here can also pursue other insurance. They negotiated an exception, each of them, to pursue insurance without a set-off. Fire victims can pursue side B proceeds. Appellants can pursue side A proceeds without a set-off. But outside of their settlements, both groups can pursue other insurance. That is, fire victims could pursue their property insurance and appellants can pursue side B proceeds. But the plan deducts recoveries from the stock or stock proceeds each creditor is entitled to receive. That latter commonality is what these appellants seek to erase in this appeal so that they can recover insurance proceeds without an offset while fire victims will continue to have insurance recoveries set off against the allowed amount of their claim, no matter what happens to PG&E's stock price or what percentage they're going to receive. Removal of the insurance deduction would be an equitable relief and it would violate the Ivanhoe Doctrine. It is also an argument that pertains to equitable litmus. The TCC requested dismissal of the related advances to McDonald Appeals and both were dismissed as equitably moved. While neither memorandum is controlling precedent, both apply the same four-factor test to the same confirmation order. Could you clarify, have the fire victims already been paid anything? It's a combination. The fire victim trust that was established was paid the full amount of the settlement of stock and cash. The fire victim trust is now determining the allowed amount of each creditor's claim and paying out the settled amounts. And do the fire victims also have lawsuits that were stayed pending the bankruptcy and that are viable and continuing post-bankruptcy? No, the fire victim settlement was a complete settlement of their lawsuits. The only exception is that they were allowed to step into the shoes of other plaintiffs in other breach of fiduciary duty claims, and that is the Side B proceeds that were obtained by settlement recently. Can you explain, how does a lawsuit affect either the appellant's or your client's ability to seek recovery from Side B coverage? It no longer does. We have settled the Side B issue and the fire trust has received a distribution of Side B proceeds. So then, I'm not clear on how the fire victims can be affected by the ruling in this case. Two ways. First, because it would upset the equitable distribution of creditor classes that was negotiated under the plan, in that this subordinated class would now have the ability to not just be paid their settlement in full, but also reach beyond to insurance proceeds to obtain both the proceeds and full amount of the stock. Because the fire victim trust is still the largest shareholder of the debtor's stock, excess recovery of stock by these appellants may impact the price of the stock or the dilution of the stock, and any implications that would have on the trust's ongoing ability to liquidate that stock for fire victims would be inevitable. And simply with respect to the third and fourth prongs of this argument, while we focused on the McDonnell Appeal as the context for those arguments, the underlying argument is what I began my argument with. This would be an equitable relief rather than the equitable relief that's required under the fourth prong. It would unfairly privilege the subordinated stockholders, subordinated securities claimants, and prejudice the fire victims. So is your argument it's going to dilute the value of your client's shares by giving more shares to the appellants than they deserve? Exactly. Yes. And as well as the fact that it erases the equitable distribution under the plan by providing higher privilege to a subordinated class than the settlement that was reached by the fire victims. For reasons that both are paid in full, despite the percentage they will ultimately receive or the price of PG&E stock. The McDonnell Appeal raised the same issue. The McDonnell Appeal sought to have the insurance deduction that applies to fire victims for their property insurance erased from the plan to ensure that they would all be paid in full no matter what PG&E stock price might be. That appeal has been dismissed as equitably moved. I see that I'm two minutes over if there are any other questions. Anybody have any other questions? All right. Mr. Atkin, I'll give you two minutes for rebuttal. Well, it's going back in two minutes, but thank you very, very much for that. You used up all your time before. No, no, no. I understand. I understand. I apologize. I think Judge Koh hit the nail on the head. Since the fire victims have settled and received $117 million from the Side B coverage in connection with their derivative claims, which are the competing claims that they complained about at pages 13 to 15 of their motion to dismiss as the only prejudice they would experience, that issue is off the table. There's no prejudice with respect to that. They've gotten a settlement, an actual settlement of $117 million. In terms of the dilution issue, I think there are some facts that have occurred since briefing has been completed in this case that are public record facts that are important in terms of really examining what that dilution is. First of all, I think, Your Honors, it's important to note that the fire victims had approximately 477 million shares as part of their settlement with PG&E. They now have approximately 127 million shares. They have sold off close to 75% of their shares and no dilution there. The total float of PG&E stock, again, a matter of public record, is approximately 2 billion shares. If you look at what the Side B insurance that's left after the payment to the fire victims, there's approximately $155 million. That's the absolute total of any offset that could exist in terms of the current set of facts. So you drill down on that and you examine what they have left, how much insurance is left, what that translates into, and at the end of the day, you're talking about maximum dilution of one quarter of 1%. It's de minimis. So the dilution issue is really a red herring. And the last thing I want to note is we have a serious disagreement as to what kind of settlement was made and what we agreed to and what we didn't. Again, the threshold issue is, what's the allowed claim of a Class 10A2 creditor? We didn't compromise that. That has to be resolved either through settlement or litigation and, again, solely as against the debtor. What we compromised was the formula to be applied acknowledging that these are subordinated, impaired claims. So the idea that we settled on the fact that there was an agreement that this constituted payment in full, that's nowhere in the record and that's simply not the case. Payment in full would mean that the allowed claim from whatever source is being paid in full. We accept what we're getting out of the PG&E bankruptcy. It's not payment in full, but it's in full satisfaction of our claim against PG&E. The insurance deduction focuses on claims against non-debtor third parties and recoveries there from a particular part of the insurance, which is Side B coverage. Those claims are preserved. We can pursue those claims. We don't have any issue with an insurance deduction if at the end of the day, when you combine those two elements, that it exceeds 100% of the allowed claim. At that point, you have double recovery and there needs to be some offset. But until you reach that point and until you have the facts and the numbers to reach that point, you can't assume double recovery and that's the problem with what the bankruptcy court did in the first instance. And I appreciate the additional time. All right. Thank you very much. Do you have a question, Judge Koh? I apologize, Judge Wardlaw, but could I ask one more question of PG&E? Sure. And I apologize to my colleagues and to the council. You say that the question about whether they were paid in full was a factual finding. I'm looking at page 26-27, unless I'm reading that wrong. But now you're saying it's a mixed question of fact and law. Is that correct? I think the way the court can interpret the language in the plan and then you have to look at how the bankruptcy court then applied that in light of the confirmation hearing. But I think the language of the plan, for example, talking about full satisfaction, I think the court can look at what that means as a matter of law, giving it its usual and typical meaning. Thank you, Judge Wardlaw. All right. Thank you, counsel. Public Employees Retirement Association versus PG&E will be submitted, and this session of the court is adjourned for today. Thank you, Your Honors. Thank you, Your Honors. Thank you. Court for this session stands adjourned.
judges: WARDLAW, NGUYEN, KOH